IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KAREN LOUISE TOLLEY,

            Plaintiff,

            v.                                          Civil Action No. 2:07-CV-37

MICHAEL J. ASTRUE,
Commissioner of Social Security,

            Defendant.


## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I.  Introduction

A.      Background

        Plaintiff, Karen Tolley, (Claimant), filed her Complaint on April 30, 2007, seeking

Judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on October

22, 2007.[2]  Claimant filed her Motion for Summary Judgment on November 21, 2007.[3]

Commissioner filed his Motion for Summary Judgment on December 7, 2007.[4]

B.      The Pleadings

        1.      Plaintiff's Motion for Summary Judgment.

        2.      Defendant's Brief in Support of His Motion for Summary Judgment.

---

[1] Docket No. 1.

[2] Docket No. 6.

[3] Docket No. 9.

[4] Docket No. 10.

C.     <u>Recommendation</u>

I recommend that:

1.     Claimant's Motion for Summary Judgment be **<u>DENIED</u>** because substantial evidence supports the ALJ's credibility determination <u>and</u> the omission from Claimant's RFC of a lower-extremity restriction.

2.     Commissioner's Motion for Summary Judgment be **<u>GRANTED</u>** for the same reasons set forth above.

## II.  Facts

A.     <u>Procedural History</u>

Claimant filed an application for Disability Insurance Benefits and Supplemental Security Income on March 16, 2004, alleging disability since August 31, 2003 due to diabetes mellitus, diabetic neuropathy, stomach problems, bad nerves, sleep disorder, and poor memory. The application was denied initially on August 30, 2004 and upon reconsideration on April 25, 2005. Claimant requested a hearing before an ALJ and received a hearing on March 22, 2006. On May 19, 2006, the ALJ issued a decision adverse to Claimant. Claimant requested review by the Appeals Council but was denied. Claimant filed this action, which proceeded as set forth above.

B.     <u>Personal History</u>

Claimant was 30 years old on the date of the March 22, 2006 hearing before the ALJ. Claimant completed tenth grade and has prior work experience as a waitress, cashier, pizza/deli worker, store laborer, and supervisor for kitchen preparation.

C.    Medical History

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability: August 31, 2003 through May 19, 2006:[5]

**DDS Physician, 5/27/04 (Tr. 135)**
Physical Residual Functional Capacity Assessment
Exertional Limitations
      Occasionally lift and/or carry 50 pounds
      Frequently lift and/or carry 25 pounds
      Stand and/or walk about 6 hours in an 8-hour workday.
      Sit about 6 hours in an 8-hour workday.
      Push and/or pull unlimited.
Postural Limitations: None established
Manipulative Limitations: None established
Visual Limitations: None established
Communicative Limitations: None established
Environmental Limitations: None established
Symptoms: Positive diagnosis of diabetes mellitus - under treatment - poorly controlled as yet.
      Also with complaints of stomach pain - diagnosis of resolving gastritis. Complaints
      of fatigue and has increased blood sugar over 200 which contributes to fatigue.
      Reduced RFC to medium considering history and complaints.

**Martin Levin, M.A., 6/23/04 (Tr. 155)**
General Observations: Posture and gait were within normal limits and there were no unusual
involuntary movements noted.  The claimant appeared to be able to move about without
assistance.
Diagnosis: Axis III: Diabetes, stomach problems, fatigue, all as reported by the claimant.

**Advanced Diabetic Endocrinology, 9/1/04 (Tr. 176)**
Impression:
1) DM.

---

[5] Claimant was last insured on December 31, 2003.  (Tr. 18).  Pursuant to 20 C.F.R. §
404.131(a) and Johnson v. Barnhart, 434 F.3d 650, 655-56 (4th Cir. 2005), petitioner's
qualification for disability benefits is conditioned on her ability to prove she became disabled on
or before December 31, 2003.  Medical records dated prior to December 31, 2003 are therefore
relevant.  Medical records dated after December 31, 2003 are also relevant, however, because
assuming petitioner can demonstrate her disability began on or before December 31, 2003, she
must also demonstrate that her disability "existed continuously since some time on or before"
December 31, 2003.  See Id., quoting Flaten v. Sec'y of Health and Human Servs, 44 F.3d 1453,
1458 (9th Cir. 1995).

2) Hypertension.
3) Hyperlipidemia.
4) Diabetic neuropathy.

**Advanced Diabetic Endocrinology, 7/29/04 (Tr. 178)**
<u>Symptoms</u>: Tingling; Numbness.

**Advanced Diabetic Endocrinology, 4/19/04 (Tr. 181)**
<u>Impression</u>:
1) DM, type 1.
2) Hypertension.
3) Hyperlipidemia.

**Advanced Diabetic Endocrinology, 2/18/04 (Tr. 183)**
<u>Impression</u>: Diabetes type I vs. type II; we will treat as if she has type I diabetes. Will intensify insulin regiments as follows . . . On next visit we will check her 24-hour urine collection for protein and creatinine clearance.

**DDS Physician, 9/20/04 (Tr. 197)**
<u>Physical Residual Functional Capacity Assessment</u>
Exertional Limitations: None established
Postural Limitations:
      Climbing - ramp/stairs: frequently
      Climbing - ladder/rope/scaffolds - occasionally (secondary to poorly controlled diabetes
            mellitus hyperglycemia.
      Balancing/Stooping/Kneeling/Crouching/Crawling - frequently
Manipulative Limitations: None established
Visual Limitations: None established
Communicative Limitations: None established
Environmental Limitations: Unlimited, except for Hazards (machinery, heights, etc) - avoid even
            moderate exposure (due to poorly controlled diabetes mellitus).
Symptoms: Claimant has diabetes mellitus type I. On 4-19-04 visit Dr. Haq states DM better
      control. Should monitor ___. Secondary to hyperglycemia. RFC has been reduced.
      Claimant is credible.

**Grafton City Hospital, 2/16/05 (Tr. 209)**
<u>Findings</u>: Both lower extremities were imaged. The common and superficial femoral vein was well a popliteal vein compress normally and appear patent bilaterally.
<u>Impression</u>: No evidence of lower extremity DVT bilaterally.

**Christopher Villaraza II, M.D., 4/8/04 (Tr. 213)**
<u>Assessment</u>:
1) Chest pain probably pleuritic.
2) Chronic bronchitis, tobacco use.

3) Insulin-dependent diabetes mellitus.
4) Gastroesophagael reflux disease.

**Dr. David Rosiello, M.D., Grafton City Hospital, 8/30/04 (Tr, 237)**
Duplex Doppler of the lower extremities was performed with history of rule out DVT. There is no evidence to suggest any deep venous thrombosis with normal intraluminal compression and flow.
Impression: unnremarkable deep venous Doppler study negative for DVT.

**Tygart Valley Total Care Clinic, 2/22/04 (Tr. 273)**
Symptoms: burning sensation/stabbing pain

**Tygart Valley Total Care Clinic, 8/19/04 (Tr. 276)**
Symptoms: Patient still having a lot of leg cramps.

**Tygart Valley Total Care Clinic, 8/5/04 (Tr. 277)**
Symptoms: Patient here for __ leg cramps.
Assessment: Leg cramps . . . diabetic neuropathy.

**Tygart Valley Total Care Clinic, 5/27/04 (Tr. 280)**
Normal gait, but unable to walk on tip-toes...with stumbling.

**DDS Physician, 4/21/05 (Tr. 297)**
Physical Residual Functional Capacity Assessment
Exertional Limitations:
>    Occasionally lift and/or carry 50 pounds
>    Frequently lift and/or carry 25 pounds
>    Stand and/or walk about 6 hours in an 8-hour workday.
>    Sit about 6 hours in an 8-hour workday.
>    Push and/or pull unlimited.

Postural Limitations:
>    Climbing - ramp/stairs/ladder/rope/scaffolds: occasionally
>    Balancing/Stooping/Kneeling/Crouching/Crawling - frequently

Manipulative Limitations: None established
Visual Limitations: None established
Communicative Limitations: None established
Environmental Limitations: Avoid concentrated exposure to extreme cold and to hazards
>    (machinery, heights, etc).

Symptoms: The symptom(s) is attributable, in your judgment, to a medically determinable
>    impairment.
>    -no self-care deficits; reduced sleep secondary to leg pain ("charley horses"); able to
>    "make sure kids have bath and dressed for school"; reduced cooking and cleaning with
>    husband and mother-in-law providing assistance.
>    -Pain: "my hands and feet hurt a lot" and complains of falling asleep often.

-Credibility: partial; claimant with IDDM and peripheral neuropathy that do not meet/equal a listing and can cause some level of pain and fatigue but certainly not to extent alleged by claimant. MER shows several incidences of ketosis but not ketoacidosis.

I agree with above: all considered and RFC reduced to light.


**Tygart Valley Total Care Clinic, 12/15/05 (Tr. 310)**
Bilateral knee pain.
<u>Symptoms</u>: complains of bilateral knee pain; right knee a little worse; describes as sharp pain; pain worse in cold weather; knees feel weak at times - "I'll be standing and they'll just drop."
<u>Assessment</u>: Bilateral knee pain - probably patella femoral syndrome.


**Tygart Valley Total Care Clinic, 8/8/05 (Tr. 311)**
<u>Symptoms</u>: Patient was walking up a bank, fell, and "caught herself;" back pain getting worse; pain radiates down legs at times.


**Tygart Valley Total Care Clinic, 8/23/05 (Tr. 311)**
<u>Symptoms</u>: Patient here as continued left low back left leg occasionally goes numb - lateral surface. Pain getting worse. Decreased strength left leg.
<u>Assessment</u>: Lumbar radiculopathy.


**University Health Associations, 7/7/05 (Tr. 313)**
Pain and burning in feet improved.


**University Health Associations, 3/20/5 (Tr. 329)**
Has burning in hands and feet.


**University Health Associations, 2/15/5 (Tr. 330)**
Complains of burning prickly pain in hands and feet.


**University Health Associates, 2/15/05 (Tr. 332)**
Regarding hand and feet numbness, diabetic.
<u>Review of systems</u>: Joint pain (knees); Arm or leg numbness; gets up often at night to urinate.


**University Health Associations, 12/17/04 (333)**
<u>Assessment</u>: DM/ neuropathy.


**WVU Electromyography Laboratory, 10/28/04 (Tr. 335)**
<u>Impression</u>: This study is consistent with an early demyelinating generalized neuropathy. Follow-up study is recommended if clinically indicated.


**Dr. John Brick, University Health Associations, 10/21/04 (Tr. 337)**
-We saw your patient today for foot pain and numbness. . . She tells me for the past 5 to 6

months, she has been having burning, numbness, cold and cramping in her feet. She tells me if feels like there are socks crushed up under my feet and also like pins and needles burning in my feet as well. She tells me it is so bothersome now that she cannot even stand to have covers over top of her feet when she is in bed. She tells me it seems to be getting worse and she is also noticing it now in her hands as well.

-Gait was steady. . . . She has decreased vibratory and pinprick sensation up to her mid ankle. Her muscle exam was 5/5. Stretch reflexes were symmetric except for the ankle jerks, which were missing and her toes went down on plantar stimulation.

<u>Assessment</u>: Diabetes and diabetic neuropathy. . . . We area also going to obtain an EMG on her to see how much nerve damage she has as well.

**University Health Associates, 10/2/04 (Tr. 343)**
Pain in feet.
<u>Assessment</u>: 1) DM, 2) Diabetic neuropathy.

**Dr. Jain, M.D., West Virginia University Hospitals, 6/20/05 (Tr. 345)**
<u>Discharge diagnoses</u>: 1) Diabetic ketoacidosis, 2) Left lower lobe pneumonia, 3) Hyperlipidemia.
<u>Hospital Course</u>: . . . The patient was advised to be compliant with her insulin regimen since she had not been compliant in the past.

**Grafton City Hospital, 12/15/05 (Tr. 414)**
<u>Left knee</u>: Four views of the left knee were obtained. There is no evidence of fracture or dislocation. The joint maintains a normal appearance, and there is no evidence of joint effusion.
<u>Impression</u>: Normal left knee films.

**Grafton City Hospital, 12/15/05 (Tr. 415)**
<u>Right knee</u>: AP and lateral view of the right knee were obtained. There is no evidence of fracture or dislocation. The joint maintains a normal appearance, and there is no evidence of joint effusion.
<u>Impression</u>: Normal right knee films.

**Jon. S. Laplante, M.D., Grafton City Hospital, 8/28/05 (Tr. 419)**
<u>MRI L Spine</u>: T1 and T2 weighted sagittal and axial images were obtained which demonstrate normally preserved alignment throughout the lumbar spine. Normal vertebral body heights and disk space intervals are preserved. No abnormal signal is present within the disks or vertebral bodies. There is no evidence of disk herniation. There is no canal stenosis or foraminal narrowing. The conus medullaris ends normally at the L1-2 level. The visualized soft-tissue surrounding the lumbar spine are unremarkable.
<u>Impression</u>: Normal MRI examination of the lumbar spine.

**Grafton City Hospital, 12/30/05 (Tr. 444)**
<u>Muskuloskeletal</u>: Lower extremity: N/A
<u>Neurological</u>:

Gait normal
Reflexes
    Knee jerk (right and left): normal
    Ankle jerk (right and left): normal
Motor Strength
    GrToeDorsiflex (right and left): normal
    FootPlantar Flexion (right and left): normal
    Sensory Deficit (right): No

**Christopher A. Villaraza, II, M.D., Grafton City Hospital, 1/16/06 (Tr. 449)**
Subjective: The patient is a known type 1 diabetic who developed an abscess on the left buttock a few days ago.  Four days ago she stopped her insulin shots.
Assessment: 1) Diabetic ketoacidosis, 2) Acute gastroenteritis, 3) Abscess, left buttock.

**Gavrillo Lazovic, M.D., Fairmont General Hospital, 1/16/06 (Tr. 467)**
Karen Tolley is a 30-year-old white female who was admitted to the hospital's Intensive Care Unit due to diabetic ketoacidosis.  She was unable to provide Insulin and was not getting insulin for two or three days.
Impression: 1) Diabetic ketoacidosis, 2) Type 1 diabetes mellitus, 3) Abscess of the right gluteal area.
Discharge Instructions: The patient was educated on the importance of persistent insulin treatment on continuous insulin treatment and frequent checkups.

**Gavrillo Lazovic, M.D., Fairmont General Hospital, 1/16/06 (Tr. 468)**
History of present illness: This is a 30-year-old white female with a known history of type 1 diabetes who could not afford buying insulin and was cutting the dose and she stopped taking insulin two days prior to admission.
Impression: Diabetic ketoacidosis.

**Gavrillo Lazovic, M.D., Fairmont General Hospital, 1/16/06 (Tr. 469)**
Impression: 1) Abscess, right buttock, 2) Insulin-dependent diabetes mellitus, with ketoacidosis.

**Dr. Eugenio Menez, M.D., 1/31/06 (Tr. 508)**
Physical Examination: Neural - negative
Assessment: 1) __DM, 2) diabetic neuropathy, 3) __, 4) __.

D.    Testimonial Evidence

Testimony was taken at the March 22, 2006 hearing.  The following portions of the

testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ATTORNEY]  (Tr. 534)

Q	Now what is it primarily that prevents you from working at this point?

A	The pain in my feet is severe and I'm constantly tired.

Q	All right. And what is that, what is that coming from?

A	Coming from the Diabetes they said.

Q	And when were you diagnosed with Diabetes?

A	In September 2003.

Q	And what symptoms were you having at that point that led you to the doctor?

A	I was, I couldn't control my urine. I had to go constantly. Falling asleep. I would sleep just fall right to sleep if I was sitting down. Thirsty. I couldn't remember much of anything.

*	*	*

Q	Excuse me. Now, on an average day, actually I want to back up and ask you about your hands and feet first.

A	Okay.

Q	Do you have problems with your hands at this point?

A	I do, but it's not nearly as bad as my feet.

Q	Okay. How often do you have symptoms with your hands?

A	Just once in a while, like it may be twice a month or so with my hands.

Q	And what happens on those days?

A	Well, they feel like they're asleep, like a tingling feeling. They're asleep constantly all day and I'll be rubbing them. I could be holding something in my hand, just jerks open and I drop stuff. I have now, and this is like all the time, I have not as much strength in my

hands as I used to.  They're pretty weak.

Q       So that's, that happens at times when you're not having the numbness and tingling?

A       Yeah.

Q       The weakness?

A       The weakness is in my hands all the time, yeah.

Q       And how does that affect your ability to use your hands?

A       It's pretty hard when you're used to like just doing something on your own, you know, picking up something or getting a gallon of milk.

Q       Can you pick up a full gallon of milk?

A       If I use both of my hands.

Q       Any problems with small items, combs and spoons and, you know, pens and things like that?

A       Not, no.

Q       Okay.  When did the symptoms with your hands begin?

A       Probably about six months after I was diagnosed.

Q       Now you've mentioned your feet.  What kind of symptoms do you have in your feet?

A       My feet, they're constantly on fire.  I have to take off my socks and blow on my feet and then it feels like bees stinging my feet.  It's pretty constant a pain.

Q       Are there times when it's worse than others or better than others or does it stay fairly constant?

A      It seems like it stays fairly constant, like if I don't have anything on my feet, it kind of eases it a little bit.  It's not as hot.

Q      You mean like shoes and socks?

A      Yeah.

Q      Okay.  How long, generally, are you able to stand?  If you're standing in one place, you could shift your weight, but pretty much standing in one place?

A      I could probably stand for about 20 minutes if that's a good day.

Q      Okay.  And what about on a bad day?

A      I try not to stand, go to the bathroom and that's about it or I walk on the sides of my feet instead of flat footed.

Q      And what about walking?  On a good day, how do you do?

A      I have to take it slow and I'm, it's not too bad as long as I'm holding onto something so I don't fall or stumble.

Q      And on a bad day?

A      It's pretty, I, it's hard to even walk.  I have to walk either on my heels or on the side of my feet.  I just - -

Q      So how often do you have bad days like what you've described with your walking?

A      Probably about three-quarters of the month at least.

Q      Now do you have, does it bother your feet to sit in a straight chair like you're in today with your feet on the floor?

A      It really doesn't matter if I'm sitting or laying.  And it hurts, it hurts, I have to

just, sometimes it'll, I could be fine and then all of a sudden it, the stinging feeling feels and then it burns and it's kind of embarrassing. You have to throw off your shoes and start rubbing your feet.

Q        Now tell me what a typical day is like for you. What time do you go to bed at night?

A        I try to go to bed about 9:00, but then I don't sleep very good at night at all. I get up probably about every 20 to 40 minutes I get up.

Q        Why?

A        To go to the bathroom and I just can't sleep. And then I'll doze off and then I'll wake right back up.

Q        So what time do you get up for good in the morning?

A        Probably about between 5:30 and 6:00.

Q        Now you have children. Is that right?

A        I have two.

Q        Now how old are your children?

A        11 and 9.

Q        And do you, do they catch a school bus or do you take them to school?

A        They catch a school bus.

Q        Do you get them up in the morning?

A        Yes.

Q        And get them ready for school, things like that?

A        Yeah. I get them up and they pretty much get themselves ready for school.

Q        Okay.  Now after the kids go to school, well, how do you spend your day?

A        I try to start like making their bed or something and I'll do stuff around the house for about half an hour and then I'll lay back down because I get tired.  Then I'll get right back up and probably sit on the couch for awhile and, of course, go to the bathroom like I usually do and I drink a lot.  That's about it.

Q         So are you able to do any of your household chores?

A        Actually, my husband does most of those now.

Q        What are you able to do?

A        I try folding clothes and stuff like that.

Q        Do you do laundry?

A        He goes downstairs and does that for me and brings it up to me and then I'll fold them.

Q        What about dishes?

A        I pretty much have my daughter to load the dishwasher and I do it.

Q        Vacuuming?

A        I do some of that if my feet's not bothering me on my good days.

Q        What about cooking?

A        That's pretty much my husband's job, too.

Q        Now you've talked about having to go to the bathroom a good bit.

A        Yeah.

Q        On an average day, how frequently do you have to use the bathroom?

A        About every 20 minutes, 20, 25 minutes, yeah.

Q        And is it something that you're able to control?  Like if you're out somewhere, can you wait to go?

A        No.  Actually, when I've got to go, I've got to go.  I, if I'm out and I know we're not going, if I'm afraid that we're not going to be somewhere to stop real quick, I'm usually wearing Depends or pads.

Q        Now do you do anything socially?  Do you go out, go out to eat, go to movies, go to dinner, things like that?

A        Usually we just order something in because we, I never know if I can eat it or not.

*                    *                    *

Q        Now do you go to church?

A        No, but I am a Christian.

Q        Do you have relatives nearby?  Do you visit your family and friends, things like that?

A        Not really.

Q        What about with your children, do you go to their school activities?  Are they, do they participate in sports, things along those lines?

A        I used to, but I don't really do much of that anymore either.

Q        What do your kids participate in?

A        My son is in basketball.  He just finished.  And my daughter's in drama.

Q        Have you gone to any of his games?

A        I've been to one.

Q        What about your daughter?  She do plays and things like that?

A       Yeah.  That's what she's in.

Q       Have you been to any of those?

A       No, ma'am.

Q       Now you've talked about being able to be up for a while and do some things and then you mentioned laying down.

A       Uh-huh.

Q       We look at a, in an eight, what would be a typical eight hour work day, from 8:00 to 5:00.

A       Okay.

Q       How much of that time do you believe that you are laying down on an average day?

A       On an average day, probably from, probably about two to three times a day.

Q       And for how long each time?

A       20, 25 minutes, maybe a half hour if I'm lucky.

Q       And on the bad days?

A       On bad days, I usually just stay in bed.  I'm so tired I can't stay awake.

Q       And what about very good days?

A       Good days, maybe twice a day if I'm lucky.

ATTY:        Your Honor, I don't have any other questions.

*               *               *

E.       Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing

and through medical records.  The information is included in the report to demonstrate how the

Claimant's alleged impairments affect her daily life.

- Gets her two children (aged 9 and 11) up for school, feeds them, and makes sure they are bathed and dressed for school.  (Tr. 103, 541)

- Has "no problems" with personal care.  (Tr. 104)

- Prepares toast, cereal, fruit, and sandwiches.  (Tr. 105)

- Sits outside on swing three times per week.  (Tr. 106)

- Tries to read twice per day.  (Tr. 107)

- Visits with friends at her house twice per week.  (Tr. 107)

- Able to pay bills and count change.  (Tr. 115)

- Watches "a little" television.  (Tr. 116)

- Able to drive herself to appointments.  (Tr. 155)

- Takes children outside to play in summer months.  (Tr. 157)

- Listens to the radio.  (Tr. 157)

- Able to stand for twenty minutes.  (Tr. 540)

- Makes her children's beds. (Tr. 542)

- Folds laundry.  (Tr. 542)

- Able to vacuum on "good" days.  (Tr. 542)

- Attends children's after-school activities, but she doesn't "really do much of that anymore."  (Tr. 544)

- Lays down 2-3 times per day, for 20-25 minutes at a time.  (Tr. 545)

-

### III.  The Motions for Summary Judgment

A.      Contentions of the Parties

Claimant alleges the ALJ erred by 1) concluding her allegations of subjective symptoms were not entirely credible, and 2) failing to include in her RFC a restriction on lower-extremity functioning.  Commissioner contends the ALJ's credibility determination and RFC assessment are supported by substantial evidence.

B.      The Standards.

1.      Summary Judgment.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.      Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.      Social Security - Medically Determinable Impairment - Burden. Claimant bears

the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4. Social Security - Medically Determinable Impairment. The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5. Disability Prior to Expiration of Insured Status- Burden. In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status. Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6. Social Security - Standard of Review. It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7. Social Security - Scope of Review - Weight Given to Relevant Evidence. The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly

indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

 8. Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

 9. Social Security - Sequential Analysis.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job.  Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C. Discussion

 1. Whether the ALJ Erred When Concluding Claimant's Allegations of Subjective Symptoms Were Not Entirely Credible.

Claimant contends the ALJ erred in concluding her allegations of subjective symptoms - including "urinary incontinence, constant tiredness, feeling thirsty, sleepiness when seated, memory problems and numbness and tingling in her fingers"- were not entirely credible.   As reflected in the record, the ALJ concluded Claimant retained the ability to perform a limited

range of medium work.  (Tr. 20-25).  Prior to so concluding, the ALJ considered Claimant's subjective symptoms, and their impact on her work-related abilities.  Id.  He found that while Claimant suffered from medically determinable impairments capable of causing the alleged symptoms, Claimant's statements as to the severity and frequency of her symptoms were not entirely credible.  Id.  His credibility determination resulted from a lengthy consideration of the entire record, including medical evidence, hearing testimony, and statements from others. Claimant alleges the ALJ's credibility determination was erroneous because he 1) required objective evidence of Claimant's subjective symptoms, in violation of Craig; ii) concluded Claimant was not credible simply because she did not follow her prescribed insulin treatment; and iii) concluded Claimant was not credible simply because her testimony was contradicted by her husband's statements.  Commissioner argues the ALJ's credibility determination is supported by substantial evidence.

> i) Whether the ALJ violated Craig by requiring objective of Claimant's
> subjective symptoms.

The ALJ, in considering Claimant's alleged foot pain and numbness, stated, "[a]s detailed above, the electromyogram performed on October 28, 2004, was reported to be consistent with an early demyelinating generalized neuropathy. [] The undersigned finds that the results of this study fail to establish an objective basis for the degree of pain in the feet alleged by the claimant." (Tr. 22).  Claimant's alleges the ALJ's statement rendered his credibility determination erroneous because it evidenced he discredited her foot symptoms "solely because the severity is not supported by objective medical evidence" (Claimant's words).  While Claimant is correct Craig prohibits an ALJ to discredit a claimant's statements about their symptoms "solely because they are not substantiated by objective medical evidence," Craig, 76

F.3d at 594, Claimant's allegation the ALJ violated Craig's prohibition is without merit. As the ALJ's decision reveals, the ALJ did not discredit the severity and frequency of Claimant's alleged foot pain "solely" because they were not supported by objective medical evidence. Rather, he discredited the alleged severity and frequency after considering the entire record, including past medical reports, Claimant's and her husband's lifestyle evidence, and Claimant's "numerous subjective complaints, when viewed in light of the relatively benign medical evidence." (Tr. 20-22). Such consideration was reasonable because, as set forth in Craig, the ALJ must "carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record." Id. at 594. Therefore, while the absence of objective medical evidence did play a role in the ALJ's conclusion regarding Claimant's alleged foot pain, it was not the "sole" basis for his conclusion, and therefore did not violate Craig.

> ii) Whether the ALJ erroneously concluded Claimant was not credible simply because Claimant did not follow prescribed treatment.

Claimant's second contention concerns the ALJ's discredit of the frequency of urination alleged by Claimant, and centers on his conclusion, "[c]onsidering the reports from the treating source and the claimant's history of non-compliance with her insulin regimen, the undersigned does not find fully credible the claimant's allegations of urinary frequency." (Tr. 21). Claimant contends the ALJ's conclusion was erroneous because his conclusion overlooked the fact she was unable to afford her insulin treatments.

Pursuant to Gross v. Heckler, 785 F.2d 1163, 1165-66 (4th Cir. 1986), symptoms that are reasonably controlled by medications are not disabling. Therefore, when assessing the impact of a claimant's symptoms on his or her ability to work, an ALJ may reasonably consider whether the claimant has failed to comply with prescribed treatment for the symptoms. See 20 C.F.R. §

404.1530.  The ALJ may not, however, consider a claimant's non-compliance if it stems from his or her inability to afford the treatments.  See Lovejoy v. Heckler, 790 F.2d 1114, 1117 (4th Cir. 1986).  Claimant contends she was unable to afford her insulin treatments, and directs the Court's attention to Dr. Lazovic's report dated January 2006 wherein Dr. Lazovic stated, "[t]his is a 30-year-old while female with a known history of Type I diabetes and who could not afford buying insulin and was cutting the dose and she stopped taking the insulin two days prior to admission."  (Tr. 468).

While Dr. Lazovic's report does suggest Claimant was not able to afford the treatments, there is substantial evidence in the record to support the ALJ's conclusion that Claimant could afford the treatments.  For example, Dr. Jain, in June 2005, noted Claimant's non-compliance with her insulin regimen.  (Tr. 345).  Upon discharge, Dr. Jain advised Claimant to comply with her insulin regimen.  Dr. Jain made no mention of Claimant's inability to pay for her insulin treatments.  It is reasonable to presume a physician would not advise a patient to comply with a regimen that the patient could not afford, and that the patient would inform the doctor of his or her inability to afford the treatments.  Furthermore, there is evidence in the record that Claimant had a medical assistance card.  (Tr. 71,89).  Finally, no other mention is made in the record of Claimant's inability to afford her insulin treatments.  To the contrary, her insulin regimen is referenced on multiple occasions, (Tr. 181, 345), and never in conjunction with a reference to her inability to pay.  Ultimately, while the Court does not challenge Claimant's and her husband's alleged financial difficulties, substantial evidence supports the ALJ's conclusion regarding Claimant's non-compliance with her insulin regimen.

iii) Whether the ALJ erroneously concluded Claimant was not credible simply because her testimony was contradicted by her husband.

Claimant's <u>third</u> contention alleges the ALJ, in discrediting Claimant's alleged frequency of urination, impermissibly relied on an inconsistency between her and her husband's report of Claimant's frequency of urination. Claimant's husband, in the Function Report - Adult Third Party, reported Claimant "is up every hour going to the bathroom." (Tr. 112). Claimant, at the hearing, testified she went to the bathroom every twenty to forty minutes (Tr. 541). The ALJ, in his decision, noted the above inconsistency and concluded "[c]onsidering the reports from the treating source and the claimant's history of non-compliance with her insulin regimen, the undersigned does not find fully credible the claimant's allegations of urinary frequency." (Tr. 21).

Contrary to Claimant's assertion, the ALJ's consideration of the aforementioned inconsistency was not erroneous. As set forth in <u>Craig</u>, a claimant's allegations of subjective symptoms "need not be accepted to the extent they are inconsistent with the available evidence." <u>Id.</u> at 595. Therefore, the ALJ may consider "any inconsistencies in the evidence and the extent to which they are any conflicts between your statements and the rest of the evidence, including . . . statements by your treating or examining physician or psychologist or other persons about how your symptoms affect you." <u>Id.</u>, citing 20 C.F.R. § 416.929(c)(4). Accordingly, the ALJ did not err by considering the inconsistency between Claimant's alleged "25-40 minutes," and her husband's alleged "hour.[6]

2.  <u>Whether the ALJ Erred in Determining Claimant's RFC.</u>

---

[6] Had the ALJ's discredit of Claimant's alleged frequency of urination relied solely on this arguably minor inconsistency, the ALJ's discredit may not have been supported by substantial evidence. The ALJ's discredit did not rely solely on the inconsistency, but instead resulted from consideration of the entire medical record, Claimant's lifestyle evidence, and testimony, (Tr. 20-25), and was supported by substantial evidence.

Claimant alleges the ALJ erred in her RFC because he failed to include any restriction in lower-extremity functioning. Claimant's alleges her RFC should have included a lower-extremity restriction because the ALJ had previously found - in Claimant's words - "that [Claimant] suffered from a severe impairment involving her lower extremities - diabetic neuropathy."[7] (Claimant's Brief, at 9). Commissioner contends Claimant's argument lacks merit because although the ALJ found Claimant suffered from diabetic neuropathy, there is no evidence her impairment produced any lower-extremity limitations.

The ALJ in the present case found Claimant suffered from - among other severe impairments - early diabetic polyneuropathy. (Tr. 18). He then found that Claimant had the RFC to perform medium work, and "should have no exposure to temperature extremes or environmental pollutants; should work in a low stress environment with no production line type of pace or independent decision making responsibilities; is limited to unskilled work involving only routine and repetitive instructions and tasks; and should have no more than occasional interaction with others." (Tr. 20). While Claimant is correct her RFC omitted a restriction on lower-extremity exertion, her claim the omission is erroneous is without merit because the omission is supported by substantial evidence.

Pursuant to SSR 96-8p, a claimant's RFC must reflect the ALJ's consideration of all a claimant's medically determinable impairments (severe and non-severe), and account for all "functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." See

---

[7] Diabetic neuropathy is peripheral nerve disorder caused by diabetes. Symptoms can include numbness, pain, or tingling in the feet or legs. See http://www.ninds.nih.gov/disorders/diabetic/diabetic.htm, last accessed June 19, 2008.

<u>also</u> 20 C.F.R. § 404.1545.  When identifying a claimant's limitations, the ALJ should consider "all relevant evidence of an individual's ability to do work-related activities."  <u>Id.</u>  "Relevant evidence" includes, in part, medical records, claimant's reports and statements, lay evidence, and recorded observations.  <u>Id.</u>

The "relevant evidence" in the present case documents Claimant's diabetic neuropathy and her complaints of leg and foot pain and weakness.  (Tr. 273, 276, 277, 310-11, 313, 330-377).  However, it <u>also</u> reveals substantial support for the ALJ's conclusion that Claimant's diabetic neuropathy did not give rise to any lower-extremity limitations.  Specifically, the "relevant evidence" evidence reveals Claimant's gait was steady; she did not require an assistive device; her reflexes, motor strength, and sensation were normal; and she had no neurological deficits.  (Tr. 155, 280, 414, 444, 465-66, 507-08).  Furthermore, it reveals that the three state physicians who assessed Claimant's Physical RFC determined she did not have any exertional "push and/or pull" limitations in her lower extremities, and no, or minimal, postural limitations.[8]  (Tr. 135-42, 297-304).  For these reasons, Claimant's allegation does not warrant relief.

## IV.  Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be **<u>DENIED</u>** because substantial evidence supports the ALJ's credibility determination <u>and</u> the omission from Claimant's RFC of

---

[8] In Claimant's Physical RFC Assessment dated 9/20/04, the DDS concluded Claimant was limited to "occasionally" climbing ladders/ropes/scaffolds, secondary to "poorly controlled diabetes mellitus hyperglycemia."  (Tr. 197).  Thus, the limitation arose from the DDS Physician's concern for Claimant's blood sugar levels, not her neuropathy.

a lower-extremity restriction.

2.     Commissioner's Motion for Summary Judgment be **<u>GRANTED</u>** for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.


DATED: June 24, 2008

<div style="margin-left:40%">

<u>/s/ James E. Seibert</u>
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE

</div>